UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                               :

| | |
|---|---|
| JANE DOE, | : |
| | : |
| Plaintiff, | : |
| | : |
| -v- | : |
| | : |
| UBER TECHNOLOGIES, INC., | : |
| | : |
| Defendant. | : |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__7/28/2021__

20-cv-8446 (LJL)

OPINION AND ORDER

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Uber Technologies, Inc. ("Uber") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint.  For the following reasons, the motion to dismiss is granted in part and denied in part without prejudice.

## BACKGROUND

      The Court assumes the truth of the well-pleaded allegations of the Complaint and the documents incorporated therein for purposes of the motion to dismiss.

### A.      Uber's Business

      Defendant Uber connects riders with drivers it hires nationwide, including in New York, through a downloadable smartphone application. Dkt. No. 1-1 ("Complaint" or "Compl.") ¶¶ 1, 10.  First launched in San Francisco in 2010, Uber is a Delaware corporation with its principal place of business in San Francisco. *Id.* ¶¶ 8, 10.  It also has a New York office. *Id.*

      Uber controls all aspects of the drivers' monetary relationship with the customer, including setting the fares that drivers charge to riders and collecting and limiting the drivers' contact with a customer outside of the app. *Id.* ¶ 11.  Its primary source of revenue is a significant percentage of charges to passengers for rides taken.  Its business model requires a

large pool of drivers in order to provide rides to consumers quickly and efficiently.  To do so, Uber must solicit and retain thousands of drivers.  *Id.* ¶ 12.

The Complaint alleges that the application process to become an Uber driver is simple, fast, and designed to facilitate the hiring of as many drivers as possible while incurring minimal associated costs.  *Id.* ¶ 13.  The Complaint does not describe the application process, but alleges that Uber provides minimal background checks and no oversight or monitoring of its drivers.  *Id.* ¶ 15.

### B.     Uber's Advertising

Uber has advertised its service as providing the "safest rides on the road."  *Id.* ¶ 16.  It has often depicted female passengers smiling in ads (with and without such language) as they enter and exit vehicles.  *Id.*  Uber's website also makes claims about the safety of its services:

> Whenever you are around the world, Uber is committed to connecting you to the safest ride on the road.  That means setting the strictest safety standards possible, and then working hard to improve them every day.  The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security—what we are doing in the US is an example of our standards around the world.

> From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind.

> Making cities better is at the heart of everything we do.  It's much more than improving the way people get around.  It's celebrating what makes those cities special, caring about the people who make them great, and being responsible citizens.  That's why we work hard to keep our streets safe for everyone, whether they're on foot, on a bike, or in another car.

*Id.* ¶ 18.

Uber has also marketed itself as a safe alternative to drinking and driving.  It partnered with Mothers Against Drunk Driving in a "designated rider" campaign that urged consumers to take an Uber to avoid driving under the influence.  *Id.* ¶ 17.  In 2015, Uber set up a pop-up kiosk in Toronto, Canada to offer free rides to individuals who blew into breathalyzers.  *Id.*

2

Altogether, the Complaint alleges that Uber targets solo women travelers with false statements regarding the safety of its services while also disclaiming any responsibility for ensuring such safety.  *Id.* ¶ 26.

### C.     Sexual Assault Claims at Uber

The Complaint alleges that by 2012, Uber was aware that its drivers were sexually assaulting female customers.  *Id.* ¶ 20.  Since 2012, the Complaint further alleges, Uber has been aware of ongoing sexual assaults via customer complaints and law enforcement investigations.

Up until May 2018, Uber imposed a requirement that customers agree to mandatory arbitration for individual claims of sexual assault and harassment, thereby keeping many of these early incidents shrouded in secrecy.  *Id.* ¶ 21.  Uber also forced survivors of sexual assault to sign nondisclosure agreements to prohibit them from talking about their experiences.  In addition, the Complaint alleges, Uber generally withheld data about sexual assault incidents connected to Uber rides.  *Id.*

In December 2019, Uber reported nearly 6,000 reports of sexual assaults during its rides in the United States in 2017 and 2018.  *Id.* ¶ 22.  About 92% of the victims were riders, and 89% of the victims were "women or female-identifying individuals."  *Id.*  The most frequent reports were of unwanted touching of body parts, e.g., the mouth, breast, and buttocks.  *Id.* ¶ 23.  Uber received 1,400 such reports in 2017 and 1,560 such reports in 2018.  *Id.*

The Complaint alleges that despite these ongoing reports of sexual assaults, Uber has done little, if anything, to minimize the risk of these incidents.  For example, it does not require in-vehicle video, and it does not monitor when drivers stop or deviate from their assigned routes. *Id.* ¶ 25.  It also does not evaluate or monitor when drivers are intoxicated or under the influence of other drugs, and it does not monitor if a driver stops for alcoholic drinks or illicit substances and thereafter turns the app back on and continues driving.  *Id.* ¶ 24.  Until recently, and at no

point prior to the assault at the center of this action, Uber did not provide customers with a phone contact option.  *Id.* ¶ 25.  Similarly, only as of September 2020 did Uber begin offering "a bare minimum of educational videos" to its drivers.  *Id.*

### D.     The Alleged Assault

On June 7, 2018, Plaintiff Jane Doe ordered an Uber to take her from the Chelsea neighborhood of Manhattan, New York to her home in Rye Brook, New York.  *Id.* ¶¶ 28-29. She ordered the Uber at 1:20 a.m. after meeting her friends to celebrate a birthday at various bars and restaurants.  *Id.* ¶¶ 27-28.  Plaintiff has Uber VIP status, which Uber markets as an upgraded experience with more experienced drivers; Plaintiff ordered her ride using the VIP option.  *Id.* ¶ 29.  Shortly after requesting the ride, Plaintiff received confirmation from the app that her driver, Iqbal Hussain ("Hussain"), was on his way to pick her up in a Toyota Camry.  *Id.* ¶ 30. When Hussain arrived, Plaintiff confirmed he was the correct driver and entered in the backseat of the vehicle.  Google Maps estimated that the ride would be 40 to 45 minutes.  *Id.* ¶ 31.  Given the lateness of the hour, Plaintiff nodded off in the car.  *Id.*

Plaintiff was awakened by a touch on her vagina.  *Id* ¶ 32.  Hussain had stopped the car and was next to her in the backseat with his hand up her skirt.  Plaintiff began to punch Hussain, who attempted to restrain her right wrist and twisted Plaintiff's arm in the process.  Plaintiff yelled at him to stop.  Hussain eventually relented, exited the vehicle, and re-entered the front driver's seat.  *Id.* ¶ 33.  He continued the ride to Plaintiff's residence and dropped her off at 2:35 a.m., one hour and fifteen minutes after Plaintiff had left Manhattan and more than 30 minutes later than her estimated time on Google Maps.  *Id.* ¶ 34.

Upon arriving at home, Plaintiff told her husband what had happened.  *Id.*  The following morning, Plaintiff awoke to debilitating pain in her right arm and observed bruising and scratches around her right wrist.  *Id.* ¶ 35.  She called one of her friends and recounted what

happened to her.  *Id.* ¶ 36.  At the advice of her friend, Plaintiff called the police to report the incident.  The Port Chester, Rye Brook Emergency Medical Services were dispatched to Plaintiff's address at 10:00 a.m. that day.  *Id.* ¶ 37.  Plaintiff complained of a possibly dislocated right shoulder, and she was transported by ambulance to Westchester Medical Center in a robe because of the pain caused in trying to get dressed.  *Id.* ¶ 38.  At the hospital, she recounted the prior night's assault.

The hospital diagnosed Plaintiff with a strain and provided her with a sling and instructions to follow up with her primary care physician.  *Id.* ¶ 39.  An MRI performed a few days later showed that Plaintiff's right shoulder was fractured.  Plaintiff also began treatment with a psychiatrist who diagnosed her with post-traumatic stress disorder ("PTSD"), anxiety, and a major depressive disorder as a result of the assault.  *Id.* ¶ 40.  She was prescribed a variety of medications to stabilize her through her PTSD.  Plaintiff continues to suffer from these conditions.

Plaintiff reports that she no longer feels safe in the company of others, which has affected her job and has forced her to step back from some of her work duties for fear that she will be required to take a car home to Rye Brook from Manhattan.  *Id.* ¶ 41.  She has also had to engage several psychiatric and physical health professionals, which has resulted in missing "countless" days of work.  *Id.*  She has endured steroid shots, has engaged in intense physical therapy, and continues to suffer pain in her arm.  When Plaintiff became pregnant in September of 2018, she experienced complications that caused her to be in and out of the hospital for extended periods of time; she alleges that the physical, emotional, and psychological trauma of the event of June 7, 2018 contributed in large part to her complications.

### E.      The Present Action

Plaintiff filed a civil action against Uber in state court on October 9, 2020.  She brought

three causes of action against Uber for negligence, negligent infliction of emotional distress, and

deceptive trade practices under New York General Business Law Act § 349.

Plaintiff alleges that despite Uber's promise of safety and her reliance on that promise in

using its services, Uber failed to take reasonable steps to vet the driver who assaulted her before

hiring him and took no other actions to ensure her safety despite being aware that the driver

stopped along his prescribed route.  As a result of Uber's gross negligence, Plaintiff suffered

both physical and emotional trauma that continues to this day.

Uber immediately and timely removed to federal court on the basis of diversity

jurisdiction the same day.  On October 21, 2020, Plaintiff filed an unopposed motion for leave to

file anonymously, which the Court granted on November 5, 2020.  Dkt. Nos. 6, 14.  Uber moved

to dismiss on October 10, 2020, Dkt. No. 10, Plaintiff filed her opposition on November 13,

2020, Dkt. No. 15, and Uber filed its reply on November 20, 2020, Dkt. No. 17.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must

include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact

to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  However, although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (internal quotation marks and citation omitted).

## DISCUSSION

### A.    Negligence

Plaintiff alleges that despite Uber's promise of safety and her reliance on that promise in using its services, Uber failed to take reasonable steps to vet the driver who assaulted her before hiring him and took no other actions to ensure her safety despite being aware that the driver stopped along his prescribed route.  Specifically, Uber failed to take reasonable steps to ensure the safety of riders like Plaintiff by (i) failing to employ safety measures while drivers are transporting passengers, such as monitoring its drivers and providing notification services to riders and (ii) failing to adequately screen its drivers.  Compl. ¶ 50.  Plaintiff alleges that as a result of Uber's negligence, she suffered both physical and emotional trauma that continues to this day.

To establish a prima facie case of negligence, a plaintiff must demonstrate: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon v. City of N.Y.,* 489 N.E.2d 1294, 1295 (N.Y. 1985).

In its opposition brief, Plaintiff specifically eschews any reliance upon the doctrine of respondeat superior, which makes an employer "vicariously liable for torts committed by an employee acting within the scope of the employment." *Judith M. v. Sisters of Charity Hosp.*, 715 N.E.2d 95, 96 (N.Y. 1999).  "Pursuant to this doctrine, the employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment." *Id.*  As a result, the Court need not address the questions of (1) whether Hussain should be considered an employee of Uber; or (2) whether the alleged acts occurred within the scope of his employment such that Uber could be held liable for them.  *See Phillips v. Uber Techs., Inc*., 2017 WL 2782036, at *6 (S.D.N.Y. June 14, 2017) (dismissing claim by passenger against Uber for false imprisonment, assault, and battery on basis that they were not acts "commonly done" by taxi drivers and would be outside of the scope of employment);[1] *Judith M.*, 715 N.E.2d at 96 ("Assuming plaintiff's allegations of sexual abuse are true, it is clear that the employee here departed from his duties for solely

---

[1] The *Phillips* court did not decide whether the driver was an employee or independent contractor, holding that "under New York case law, the determination of whether an individual should be classified as an employee or independent contractor is fact intensive, and is premature at the Motion to Dismiss, pre-answer stage."  *Phillips*, 2017 WL 2782036, at *4.  Other courts have similarly held that such a determination at an early stage of the litigation is premature.  *See O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D. Cal. 2015) (holding that Uber drivers are "presumptive employees," but that the ultimate issue of classification depends on disputed factual issues); *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1081-82 (N.D. Cal. 2015) (holding that determination of whether Lyft drivers are employees or independent contractors is for a "jur[y] to decide" under California law).

personal motives unrelated to the furtherance of the Hospital's business" and thus "the courts below properly dismissed plaintiff's respondeat superior cause of action").[2]

Plaintiff instead proceeds on a common carrier theory.  She alleges that, like a taxicab company, Uber is a common carrier and owes a duty to provide safe transport for passengers that all common carriers owe to their passengers.

Plaintiff relies on *Murray v. Uber Techs. Inc.*, a case in the District of Massachusetts, which held that plaintiff "stated a plausible claim that Uber should be held to the common carrier standard of liability because it operates in substantially the same manner as taxi cab companies." 486 F. Supp. 3d 468, 475 (D. Mass. 2020).  There, Uber had argued it was a transportation network company ("TNC"), which was defined by Massachusetts law as an "entity that uses a digital network to connect riders to drivers to pre-arrange and provide transportation."  *Id.* at 475 (quoting Mass. Gen. L. c. 159A 1/2 § 1).  Under Massachusetts law, TNCs are expressly exempt from certain common carrier requirements.  The court found that "Uber is, indisputably, a TNC," but the common carrier requirements to which TNCs like Uber were exempt did not include liability standards.  *Id.* ("Absent any statutory basis for determining the applicable standard of liability, the Court considers common law analogs.  As is historically the case in actions involving Uber, taxicab companies, which are common carriers, provide an apt analogy.  As this Court has previously stated, noticeable and evolving differences exist between taxis and TNCs and whether the two are similarly situated is not an issue easily disentangled and is subject to reassessment as the transportation network industry evolves.").

---

[2] *See also Minzer v. Barga*, 2020 WL 2621710, at *2 (N.Y. Sup. Ct. May 22, 2020) (assuming arguendo for purposes of the motion that Uber driver was an employee but rejecting intentional tort as outside the scope of employment); *Fusco v. Uber Techs., Inc.*, 2018 WL 3618232, at *9 (E.D. Pa. July 27, 2018) (assuming that Uber driver was an employee but rejecting intentional tort as outside the scope of employment).

Ultimately, the court held that "[a]lthough discovery may reveal that Uber operates in a manner sufficiently distinct from common carriers or exercises insufficient control over its drivers, plaintiff has at least stated a claim that, here, Uber is a common carrier and may be held liable for [the driver's] tortious misconduct." *Id.* at 476.  Specifically, plaintiff had alleged:

> Uber's ride-sharing service is available to the general public through use of the free Uber app; Uber drivers are prohibited from refusing to provide services based on, among other things, the rider's destination, income, background or race; Uber's sole source of revenue derives from riders; and Uber instructs its drivers to comply with all relevant state, local and federal law regarding the transportation of individuals with disabilities.
> . . .
> Plaintiff has further alleged that, despite Uber's classification of its drivers, including [the driver], as independent contractors rather than employees, Uber exercises control over its drivers sufficient to hold Uber liable under the common carrier standard of liability for the torts of its drivers. . . . Plaintiff specifically alleges that Uber retains the right to terminate its drivers at will, establishes the rate for any given ride, prohibits drivers from negotiating fees, does not disclose ride destinations until a driver accepts a ride and requires payment to be completed through the Uber app.  Plaintiff further alleges that she was assaulted by [the driver] during a ride requested through the Uber app which Uber assigned to [the driver].

*Id.* at 475-76.  The court found that these allegations supported "plaintiff's claim that Uber should be subject to common carrier liability because it 'holds [itself] out as furnishing transportation to any and all members of the public who desire such service insofar as [its] facilities enable [it] to perform the service.'"  *Id.* (quoting *Mt. Tom Motor Lines, Inc. v. McKesson & Robbins, Inc.*, 89 N.E.2d 3, 5-6 (Mass. 1949)).[3]

---

[3] Other out-of-circuit courts have also found Uber to be a common carrier at the pleading stage. *See Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 787 (N.D. Cal. 2016) (rejecting argument that Uber was merely "a 'broker' of transportation services" and holding that Uber fell within California's definition of "common carrier" as "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry"); *Doe v. Uber Techs., Inc.*, 2019 WL 6251189, at *6 (N.D. Cal. Nov. 22, 2019) (finding that "Uber's status as an app-based transportation network does not preclude it as a matter of law from being held liable as a common carrier" but dismissing claims because the assault occurred before plaintiff boarded or attempted to board the Uber).

This Court is not aware of a case in this Circuit discussing whether Uber is a common carrier under New York law, and upon the Court's request for supplemental briefing, the parties identify no case discussing Uber or similar services under New York law.  Instead, Uber primarily relies on a 2017 amendment by the New York legislature that stated that services, like Uber, "shall not be deemed a common carrier."  N.Y. V.T.L. § 1692(1).

On April 10, 2017, Governor Cuomo signed into law Assembly Bill 3009C/Senate Bill 2009C as Chapter 59 of the Laws of 2017, which implemented parts of the 2017-18 New York State budget.  *See Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State of N.Y.*, 336 F. Supp. 3d 50, 58 (E.D.N.Y. 2018) (discussing legislation in connection with equal protection claims).  Part AAA of Chapter 59 created a new Article 44-B of the New York Vehicle and Traffic Law ("VTL") regulating TNC services, which include ride-sharing services provided by companies like Uber and Lyft.  *See* 2017 N.Y. Sess. Laws 94.  Section 1692 of New York VTL provides:

> A TNC or a TNC driver shall not be deemed a common carrier, as defined in subdivision six of section two of the transportation law; a contract carrier of passengers by motor vehicle, as defined in subdivision nine of section two of the transportation law; or a motor carrier, as defined in subdivision seventeen of section two of the transportation law. Neither a TNC nor a TNC driver shall be deemed to provide taxicab or for-hire vehicle service while operating as a TNC or TNC driver pursuant to this article.  Moreover, a TNC driver shall not be required to register the TNC vehicle such TNC driver uses for TNC prearranged trips as a commercial or for-hire vehicle, as set forth in article fourteen of this chapter.

N.Y. V.T.L. § 1692(1).  A "TNC" is defined as "a person, corporation, partnership, sole proprietorship, or other entity that is licensed pursuant to this article and is operating in New York state exclusively using a digital network to connect transportation network company passengers to transportation network company drivers who provide TNC prearranged trips." *Id.* § 1691(3).

Plaintiff does not deny that Uber is a TNC within the meaning of this statute but makes two arguments in response.  First, as in *Murray*, the legislation here is intended to exempt

companies like Uber as common carriers for regulatory and licensing purposes but makes no reference to exempting such companies as common carriers for the purposes of liability.  Second, even if New York VTL § 1692(1) exempted Uber as a "common carrier" under New York Transportation Law § 2(6), as a "contract carrier of passengers by motor vehicle" under § 2(9) or as a "motor carrier" under § 2(17), it does not exempt Uber as a "common carrier of passengers by motor vehicle" under § 2(7).

Article 44-B is broken into ten subsections, which are titled definitions, general provisions, financial responsibility of TNCs, disclosures, insurance provisions, driver and vehicle requirements, maintenance of records, audit procedures and confidentiality of records, criminal history background check of TNC drivers, and controlling authority.  *See* N.Y. V.T.L. §§ 1691-1700.  The only references to liability are made in connection with ensuring that the TNC and/or the driver has the appropriate automobile liability insurance.  *See id.* § 1695 (discussing insurance provisions), § 1693 (discussing financial responsibility insurance requirements), § 1696(a)(1)(i) (requiring TNC driver to submit an application containing, inter alia, proof of automobile liability insurance).  The "legislative intent" of Article 44-B supports that it is intended to apply only to regulation of TNC licensing and insurance matters: "The purpose of this act is to ensure the safety, reliability, and cost-effectiveness of transportation network company (TNC) services within the state of New York and to preserve and enhance access to these important transportation options for residents and visitors to the state."  Ch. 59, Article 44-B, Part AAA § 1.  "To accomplish this, Article 44-B creates a statewide TNC licensing scheme administered by the DMV."  *Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc.*, 336 F. Supp. 3d at 58 (citing N.Y. V.T.L. § 1692(2)(a)).  Thus, the Court does not interpret it as exempting Uber as a common carrier for purposes of tort liability.

Even if Uber were correct that Article 44-B exempted it from liability as a common carrier under New York Transportation Law § 2(6), (9), and (17), the question still remains as to whether Uber could be subject to liability as a "common carrier of passengers by motor vehicle" under New York Transportation law § 2(7), which is not exempted by Article 44-B.  The relevant provisions of the New York Transportation Law are as follows:

> 6. "Common carrier" means a railroad company, street railroad company, express company, car company, sleeping-car company, freight company, freight line company, baggage company, transfer company, carrier by water, person or the lessee, trustee or receiver appointed by any court whatsoever, owning, operating or managing any such agency for public use in the conveyance of persons or property within this state other than by use of ski tows and other passenger tramways operated at ski centers. The term shall not include an express company, baggage company or transfer company unless it is operated wholly or in part upon or in connection with a railroad or street railroad or a municipally owned ferry or ferry company operating under a lease from a city or a carrier by water except where it is engaged or may be required to be engaged with a carrier by railroad in the transportation of passengers or property over a through route partly by water and partly by railroad for a continuous carriage or shipment between points in this state.

> 7. "Common carrier of passengers by motor vehicle" means any person that transports passengers by motor vehicle for compensation by providing service for the general public on an individual fare basis over regular or irregular routes. It shall include a bus line as defined by subdivision three of this section.
> . . . .
> 9. "Contract carrier of passengers by motor vehicle" means any person that transports passengers by motor vehicle for compensation, in chartered party or special party service, or by providing service under a continuing agreement calling for the exclusive use of vehicles by a person or persons.
> . . . .
> 17. "Motor carrier" includes common and contract carriers of passengers by motor vehicle, common and contract carriers of property by motor vehicle, and common carriers of household goods by motor vehicle. Any reference in article six, seven, eight or nine of this chapter to a "common carrier", "contract carrier", "common carrier of property", "contract carrier of property", "common carrier of passengers", or "contract carrier of passengers" shall be deemed to mean such type of carrier by motor vehicle.

> 18. "Motor vehicle" means a vehicle, machine, bus, tractor, truck trailer or semi-trailer, propelled or drawn by mechanical power and used upon the highways

in the transportation of property or passengers, but does not include any locomotive or car operated exclusively on a rail, rails or track.

N.Y. Transp. L. § 2.  Under New York Transportation Law Section 96, "[e]very corporation, person or common carrier performing a service designated in the preceding section shall furnish, with respect thereto, such service and facilities as shall be safe and adequate and in all respects just and reasonable."  N.Y. Transp. L. § 96.  The preceding section refers to "the transportation of passengers or property from one point to another within the state of New York, and to any common carrier performing such service."  N.Y. Transp. L. § 95.

New York law no longer holds common carriers to a heightened duty of care; the ordinary standard of negligence applies.  "Although carriers were once obligated to exercise a heightened duty of care, they are now 'subject to the same duty of care as any other potential tortfeasor—reasonable care under all of the circumstances of the particular case.'"  *Vumbaca v. Terminal One Grp. Ass'n L.P.*, 859 F. Supp. 2d 343, 370 (E.D.N.Y. 2012) (quoting *Bethel v. N.Y.C Transit Auth.*, 703 N.E.2d 1214, 1218 (N.Y. 1998)).  Under that standard, a "common carrier has an obligation 'to conserve the safety, convenience and comfort of its passengers.'"  *Id.* (quoting *Garricott v. N.Y. State Rys.*, 119 N.E. 94, 95 (1918)); *see Voccia v. United States*, 2017 WL 1194652, at *6 (E.D.N.Y. Mar. 31, 2017) ("Under New York law, a transportation provider . . .has a duty to exercise reasonable care for the safety of its passengers."); *Kelly v. Otis*, 593 N.Y.S.2d 673, 673 (4th Dep't 1993) ("A private carrier owes a duty to exercise reasonable care for the safety of its passengers.").

However, if Uber is held to be a common carrier of passengers by motor vehicle under New York law, it will owe its passengers a statutory duty to "furnish . . . service and facilities [that are] safe and adequate" and a duty to protect passengers from even third-party tortfeasors.  N.Y. Transp. L. § 95.  A special duty may arise where "there is a relationship either between

defendant and a third-person tortfeasor that encompasses defendant's actual control of the third

person's actions, *or* between defendant and plaintiff that requires defendant to protect plaintiff

from the conduct of others." *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1061 (N.Y.

2001) (emphasis added).  A relationship between "common carriers and their passengers" can

constitute the latter relationship.  *Id.*; *see also* Restatement (Third) of Torts: Liability for Physical

Harm § 40 (2012) (common carrier has a special relationship with its passenger and "owes the

other a duty of reasonable care with regard to risks that arise within the scope of the

relationship").  "[T]he duty of care imposed on a common carrier with respect to its passengers

requires not only that it keep the transportation vehicle safe, but also that it maintain a safe

means of ingress and egress for the use of its passengers." *Bingham v. New York City Transit

Auth.*, 864 N.E.2d 49, 51 (2007).  "This duty has been applied to those areas owned and

maintained by others if 'constantly and notoriously' used by passengers as means of approach."

*Id.* at 52.  As a common carrier, Uber's duty would not be dependent on whether Hussain is an

employee or independent contractor for Uber; Uber would owe a duty to passengers regardless of

whether Hussain was an independent contractor.  *See, e.g.*, *Doe*, 184 F. Supp. 3d at 787 ("The

liability of a common carrier for an assault by one of its employees on a passenger is not

dependent on the question as to whether the employee was acting within the scope of his

authority or in the line of his duty, but is based upon its broad duty as a common carrier to

protect its passengers from assault."); *Murray*, 486 F. Supp. 3d at 477 (holding Uber was

common carrier and therefore declining to "resolve whether [the driver] is an Uber employee

rather than an independent contractor because, as a matter of law, sexual assault necessarily falls

outside the scope of employment").

A special duty may also arise through an employer-employee relationship under the doctrine of respondeat superior. *See, e.g.*, *D'Amico v. Christie*, 518 N.E.2d 896, 901-02 (N.Y. 1987)). In either relationship, "[t]he key in each is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Hamilton*, 750 N.E.2d at 1061. If Uber is not a common carrier or in an employer-employee relationship, it "generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." *David v. Weinstein Co. LLC*, 2019 WL 1864073, at *6 (S.D.N.Y. Apr. 24, 2019) ((quoting *D'Amico*, 518 N.E.2d at 901).

Uber argues that it does not fall within the definition of a common carrier under New York Transportation Law § 2(7) because it does not offer transportation to the "general public." Instead, it claims that it offers its services only to individual registered users with an account who sign up privately for the app, input personal and financial information, and agree to Uber's contractual terms. Uber drivers have freedom to cancel a ride request submitted through the app. It argues that unlike other common carriers, such as taxis, "Uber can deactivate users at any time and for any reason." Dkt. No. 20 at 2. In addition, the "Rider Terms of Use" require the user to accept terms that include a statement that Uber "does not provide transportation services, and the company is not a transportation carrier. It is up to the third party transportation provider, driver or vehicle operator to offer transportation services which may be scheduled through use of the application or service." *Id.* Plaintiff does not dispute the truth of those assertions.

Plaintiff also does not tackle Section 2(7)'s definition of a "common carrier of passengers by motor vehicle" as "providing services for the general public," instead falling back on the "broad definition" of a common carrier under New York common law, which is "one who agrees

for a specified compensation to transport such property [or persons] from one place to another for all . . . that may see fit to employ him." *Vumbaca v. Terminal One Grp. Ass'n L.P.*, 859 F. Supp. 2d 343, 370 (E.D.N.Y. 2012) (quoting *Gerhard & Hey v. Cattaraugus Tanning Co.*, 150 N.E. 500, 501 (N.Y. 1926)); *see Samuelsen v. Yassky*, 911 N.Y.S.2d 570, 575 (Sup. Ct. 2010) ("Common law defines the term 'common carrier' as 'one who carries passengers as well as one who carries goods, either when he carries the passenger and his merchandise or baggage or when he carries a traveler without his goods.'") (quoting *Anderson v. Fidelity & Cas. Co. of New York*, 127 N.E. 584, 585 (N.Y. 1920)).

Plaintiff primarily relies on *Samuelsen* in which union members sought an injunction pursuant to Article 78 against a pilot program created by the City of New York and the New York City TLC that sought to test the viability of a new class of for-hire transportation services, which would pick up passengers along certain bus routes where the New York City Transit Authority was no longer providing bus service.  The program permitted private or public owners of transportation businesses, including commuter van services and for-hire vehicles, to provide a fixed-fare group ride among designated pick-up and drop-off locations, though passengers could negotiate with drivers for other drop-off locations.  *Samuelson*, 911 N.Y.S.2d at 573.  Petitioners maintained that the pilot program violated New York State Transportation Law § 80(5)(a)(2), which requires the City to adopt a local law that prohibits "a van service or other such common carriers of passengers . . . from soliciting, picking up or discharging passengers at stops of, or along a route which is traveled upon" by a bus line operated by the transit authority.  *Id.* at 575. The court held that the group ride program did not violate Section 80(5)(a)(2) because the routes were not currently traveled by a bus line as those routes had previously been suspended.  In so holding, the court reviewed Section 2(7)'s definition of common carriers and equated the for-hire

vehicles with "other such common carriers" under Section 80(5)(a)(2).  It found that the "for-hire vehicles in the group ride program clearly fall within this broad definition of common carriers of passengers" under Section 2(7).  *Id.* at 575-76.

Plaintiff claims that like the for-hire vehicles in *Samuelson*, Uber is a common carrier because it "exists to carry passengers and their goods from point A to point B."  Dkt. No. 21 at 2. She also states that Uber is like a taxi service and, she argues, "taxicab services have long been considered common carriers under New York common law."  *Id.* at 2 n.2.  Finally, she points to cases in other districts that have held a plaintiff to plausibly claim, at least at the pleading stage, that Uber is a common carrier because of its similarity to taxi services.  *Id.* at 2-3; Dkt. No. 15 at 7-8; *see, e.g.*, *Murray*, 486 F. Supp. 3d at 475 ("[P]laintiff has stated a plausible claim that Uber should be held to the common carrier standard of liability because it operates in substantially the same manner as taxi cab companies.").

But Plaintiff's arguments end there.  She makes no further argument about how or why Uber qualifies as a common carrier under New York law.  *Samuelson* provided little analysis regarding how the for-hire vehicles qualified as common carriers and its holding pertained to New York Transportation Law § 80(5)(a)(2), not Section 2(7).  Moreover, the program at issue was created and managed by the New York City TLC, which is the operator of taxi services. Plaintiff also cites to *Anderson*, 127 N.E. at 586, and *Kronstad v. Pechtold*, 46 N.Y.S.2d 124, 125 (City Ct. 1943), for the proposition that Uber is like a taxi service, but those cases merely state that public taxi services are common carriers, and thus they do not, by themselves, aid Plaintiff in pleading Uber's status as a common carrier.  *See* Dkt. No. 21 at 2 n.2; *see also* *Anderson*, 127 N.E. at 586 ("Certainly the owners and drivers of purely private conveyances

cannot be subjected to this penalty."); *Kronstad*, 46 N.Y.S.2d at 125 (stating that "a public taxicab may be classified as a common carrier of passengers").

The out-of-Circuit courts that have held otherwise have relied on different statutory or common law standards or analyzed different pleading.  In *Doe v. Uber Techs., Inc.*, the district court held Uber was a common carrier based on California Civil Code § 2168, which stated that "[e]veryone who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry."  *Doe*, 2019 WL 6251189, at *6 (quoting Cal. Civ. Code § 2168).  "Hence, a common carrier within the meaning of Civil Code § 2168 is any entity which holds itself out to the public generally and indifferently to transport goods or persons from place to place for profit."  *Id.* (quoting *Squaw Valley Ski Corp. v. Superior Court*, 3 Cal. Rptr. 2d 897, 900 (Cal. Ct. App. 1992)).  That statutory language finds common carrier liability based on what the common carrier "offers" to the public, rather than the services it provides as under New York Transportation Law § 2(7).  *See Doe*, 2019 WL 6251189, at *6 (noting that under California common law, "[c]ommon carrier liability can attach even for transportation services that are of possible use to only a fraction of the population") (internal citations and quotation marks omitted).  Another case in a California district court is distinguishable for that reason (that the California statute is different than the New York statute) as well as because Uber did not make the argument that it had the ability to remove an Uber customer's riding privileges, which would distinguish it from other common carriers.  *See Doe*, 184 F. Supp. 3d at 787.  Uber makes that argument here. And in *Murray*, Plaintiff alleged that Uber drivers held themselves out as "furnishing transportation to any and all members of the public who desire such service insofar as [its] facilities enable [it] to perform the service" and that Uber was prohibited from refusing to provide services based on, among other things, the

rider's destination.  *Murray*, 486 F. Supp. 3d at 475-76 (quoting *Mt. Tom Motor Lines, Inc. v. McKesson & Robbins, Inc.*, 89 N.E.2d 3, 5-6 (Mass. 1949)).[4]

        In contrast, the Complaint here is devoid of any non-conclusory or factual allegations describing how Uber "provide[s] services for the general public" under New York Transportation Law § 2(7) or how Uber is sufficiently similar to taxi companies under New York common law.  Based on the absence of any positive pleading about Uber as a common carrier, Plaintiff has failed to allege that Uber is a common carrier.  *See People v. Pfingst*, 148 N.Y.S.2d 640, 649 (N.Y. Magis. Ct. 1956) ("The proof in the case at bar more clearly supports the view that the defendants were only proffering or performing acts of transportation under special calls, charters or agreements.  Of course, all acts of transportation, in a sense, are restricted and special, in that even a common carrier, as a practical matter, cannot serve all of the public at any given time.  'The public does not mean everybody all the time.'  However, there is a palpable distinction between the public carrier's duty to answer all calls for service as far as able and the private carrier's privilege to serve or not to serve, at will.") (quoting *Terminal Taxicab Co. v. Kutz*, 241 U.S. 252, 254 55 (1916)); *People v. Lee*, 336 N.Y.S.2d 18, 20 (Crim. Ct. 1972) (private limousine service was "[c]ontract carrier of passengers by motor vehicle" under New York Transportation Law, and not a common carrier, because "[t]he essential difference between the common and private carrier is that the latter does not undertake to transport for the general public, rather he undertakes to provide transportation by motor vehicle under special and individual contracts or agreements").  Absent a special relationship between Plaintiff and Uber,

---

[4] The court's opinion should not be read to opine that the facts alleged in *Murray* would satisfy the New York statute, especially as the *Murray* court warned that "discovery may reveal that Uber operates in a manner sufficiently distinct from common carriers or exercises insufficient control over its drivers."  *Murray*, 486 F. Supp. 3d at 476,

Uber has no duty to control Hussain's alleged tortious actions and cannot be held liable under a negligence theory. *See, e.g.*, *David*, 2019 WL 1864073, at *6 (directors had no duty to fail to prevent sexual misconduct by the company's chief executive officer); *Rabin v. Dow Jones & Co.*, 2014 WL 5017841, at *2 (S.D.N.Y. Sept. 23, 2014) (Dow Jones had no duty to notify its subscribers of a fraudulent scheme conducted by a third-party billing service).

### B.     Negligent Screening, Hiring, and Supervision

Plaintiff seeks to hold Uber liable for negligent screening, hiring, and supervision of its drivers. To prevail on this claim, Plaintiff must allege "(1) the tort-feasor and the defendant were in an employee-employer relationship, (2) the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations and quotation marks omitted). "The employee also must not be acting within the scope of his or her employment; [for] in that situation the employer [would] only be liable . . . vicariously under the theory of respondeat superior, [and] not for negligent supervision or retention." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129-30 (2d Cir. 2019) (quoting Gr*ay v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 446 (3d Dep't 2011)); *see also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 522 (S.D.N.Y. 2015) ("New York law does not permit a claim for negligent hiring, training, retention[,] or supervision where the defendants act in the scope of their employment.") (collecting cases).

Even assuming that Hussain and Uber were in an employee-employer relationship—and the Court does not decide that issue now[5]—Plaintiff would fail to adequately allege claims of

---

[5] Courts have differed on whether Uber's drivers are Uber's employees. *Compare O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d at 1141 (holding that Uber drivers are "presumptive

negligent screening, hiring, and supervision.  Under New York law, it is not sufficient for Plaintiff to allege generally that the Defendant failed to exercise care in the screening, hiring, or supervision of employees.  Plaintiff must also allege that, had the Defendant exercised the requisite care, it would have discovered the facts that made the employee at issue unsuitable to hire or retain.  *See Travis v. United Health Servs. Hosps.*, Inc., 804 N.Y.S.2d 840, 884 (3d Dep't 2005) (noting that claims based on negligent hiring require plaintiff to show that "employee's propensity to commit the alleged acts" would have been revealed or made known to the employer "through an adequate hiring procedure") (citation and internal quotation marks omitted); *see also Fowler v. City of New York*, 2019 WL 1368994 at *15 (E.D.N.Y. Mar. 26, 2019), *aff'd*, 807 F. App'x 137 (2d Cir. 2020) ("For a failure to screen claim, the plaintiff must produce enough evidence from which a jury could find that, had the municipality adequately screened [the] application materials, the risk of a . . . violation would have been a plainly obvious consequence.") (citation and internal quotations omitted).  Thus, "New York courts have held in employee sexual misconduct cases that an employer is only liable for negligent supervision or retention if it is aware of specific prior acts or allegations against the employee."  *Doe v. Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014) (Sweet, J.) (collecting cases).  Such claims require "specific allegations of the employee's past wrongdoing."  *Id.* at 682.  In the absence of such allegations, there is no basis to believe that the Defendant's conduct in the hiring, retention or

---

employees," but that the ultimate issue of classification depends on disputed factual issues), *Doe*, 184 F. Supp. at 781 (under California law, Uber drivers are employees), *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 233 (D.D.C. 2015) ("[T]he Court cannot determine as a matter of law that [the Uber driver] was an independent contractor" or that the driver's stabbing of the plaintiff "was an act outside such employment" because the stabbing "grew out of an encounter related to Uber's business" and "was triggered by a dispute over the conduct of Uber's business (providing car service")), *with McGillis v. Dep't of Econ. Opportunity*, 210 So. 3d 220, 225 (Fla. Dist. Ct. App. 2017) (holding Uber drivers are not employees for the purposes of reemployment assistance).

supervision of the employee was the cause of Plaintiff's injury.  *See id.*; *see also Minzer*, 2020 WL 2621710, at *2 (dismissing negligent hiring, supervision, and retention claims where "[n]othing in the pleading establishes this element or suggests an inference that Uber was alerted to such a possibility").

Plaintiff fails to satisfy those standards here.  She has made no allegation of facts regarding Hussain that Uber knew or could have known with the exercise of care that should have led it to the conclusion that Hussain, in particular, posed a danger to Plaintiff.  Plaintiff does not allege any instances of past misconduct by Hussain or any other facts with respect to him that should have led Uber to concern.  Instead, she alleges that Uber was aware that "drivers" were sexually assaulting female customers because Uber received nearly 6,000 reports of sexual assault during its rides in the United States in 2017 and 2018, Compl. ¶¶ 20, 22, and she refers to Uber's "knowledge of sexual assaults of its customers by its drivers," *id.* ¶ 46.[6]  With respect to supervision, Plaintiff claims that no steps were taken to ensure Plaintiff was safe once the app registered that the vehicle was stopped outside of the original route before she was taken home and that if Uber had been recording or watching Hussain, or used monitoring to receive a warning when he deviated from the route, Plaintiff likely would have been spared from the assault.  *Id.* ¶ 47.[7]

---

[6] Plaintiff does not allege how many rides were taken on trips arranged by Uber during that same time period, making the figure of the number of assaults more difficult to contextualize for the purposes of negligence analysis.

[7] Uber also responds that it did not screen or train Hussain because he had a valid New York City Taxi and Limousine Commission ("TLC") license, and issuance of a TLC license indicates to Uber that the recipient of the license has met TLC's requirements, including mandatory training, background checks, and drug testing. Dkt. No. 11-1 ¶¶ 8-10.  Uber reviewed the business records maintained by Uber of Hussain, including business records based on his "full name, phone number, and email address," but did not disclose Hussain in connection with this litigation but did not reveal the results in this litigation.  *Id.* ¶¶ 3, 7-8.  The Court need not address Uber's argument given its dismissal of the claim.

None of those allegations is specific to the driver in this assault.  The absence in the Complaint of any allegation that there were facts that Uber knew, or could have known, about Hussain that should have led it to know of the risk that Hussain would engage in an assault is "fatal to Plaintiff's negligence claim and warrants dismissal."  *Doe*, 12 F. Supp. 3d at 680; *see, e.g.*, *Lawton v. Town of Orchard Park*, 2017 WL 3582473, at *13 (W.D.N.Y. Aug. 18, 2017) (dismissing negligent supervision and retention claim in the absence of factual allegations indicating that defendant municipal employer knew or should have known of the individual defendants' propensity for injurious conduct at their time); *Matthews v. City of New York*, 2016 WL 5793414, at *12 (S.D.N.Y. Sept. 30, 2016) (dismissing negligent hiring and supervision claim where plaintiff failed to plausibly allege facts indicating that defendants knew or should have known that there were deficiencies in employee training and supervision that caused harm); *see also Doe v. Montefiore Med. Ctr.*, 2013 WL 624688, at *3 (S.D.N.Y. Feb. 19, 2013), *aff'd*, 598 F. App'x 42 (2d Cir. 2015) ("Plaintiff's negligent supervision/retention claim comes down to whether [the employee] had a propensity toward sexual misconduct and whether Defendants were or should have been aware of that propensity."); *Bouchard v. N.Y. Archdiocese*, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) ("A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee.") (citation omitted).

### C.     Negligent Infliction of Emotional Distress

Under New York law, a plaintiff alleging negligent infliction of emotional distress ("NIED") must show "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress."  *Truman v. Brown*, 434 F. Supp. 3d 100, 122 (S.D.N.Y. 2020) (quoting *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297

(S.D.N.Y. 2015)).  A plaintiff may recover under one of two theories: (1) the "bystander theory" or (2) the "direct duty theory."  *Wahlstrom v. Metro-N. Commuter R. Co.*, 89 F. Supp. 2d 506, 531 (S.D.N.Y. 2000) (citation omitted); *see also Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996).  A plaintiff may recover for a purely emotional injury under the "bystander" theory when she is threatened with physical harm as a result of defendant's negligence and consequently suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family.  *Mortise*, 102 F.3d at 696; *see also Greene v. Esplanade Venture Partnership*, 168 N.E.3d 654, 655 (N.Y. 2021).  A plaintiff may recover under the "direct duty" theory for an emotional injury from defendant's breach of a duty that unreasonably endangered plaintiff's own physical safety.  *Id.*

Plaintiff seeks recovery on the direct duty theory, alleging that she suffered emotional and psychological injury from Uber's breach of its duty to provide safe transport to its passengers and that the breach endangered her physical safety when Hussain sexually assaulted her and fractured her right shoulder.  A NIED cause of action may lie where the conduct at issue included "sexual assault or battery, or threat thereof."  *Wahlstrom*, 89 F. Supp. 2d at 531 (citation and quotation marks omitted).  Uber responds that there can be no action for NIED when the underlying tort was intentional because conduct that is alleged to be "intentional and deliberate and allegedly in [its] nature offensive" is "outside the ambit of actionable negligence."  *Id.* at 531-32 (internal quotation marks and citation omitted); *see United Nat'l Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993) (discussing "the mutual exclusivity of negligence and battery"); Dobbs' Law of Torts § 31 (2d ed. 2020) ("Any given act may be intentional or it may be negligent, but it cannot be both.").  That argument, however, improperly conflates the theory upon which Plaintiff is proceeding against Uber with that upon which Plaintiff could proceed

against Hussain.  Plaintiff's theory against Uber is that it was negligent in placing Plaintiff in a position where she would be at risk of assault.  It is irrelevant to recovery on that theory whether Hussain acted intentionally and thus the cases which hold that claims based on intent are mutually exclusive with claims based on negligence do not themselves defeat Plaintiff's claim for relief.  *See Wahlstrom*, 89 F. Supp. 2d at 531-32 (dismissing NIED claim against co-worker who sexually assaulted plaintiff); *Wilson v. Diocese of New York of Episcopal Church*, 1998 WL 82921, at *6 (S.D.N.Y. Feb. 26, 1998) (dismissing NIED claim brought against priest who sexually assaulted plaintiff); *Schmidt v. Bishop*, 779 F. Supp. 321, 324 (S.D.N.Y. 1991) (dismissing NIED claim brought against pastor who sexually abused plaintiff).

Plaintiff's claim fails for two reasons.  First, Plaintiff failed, under her general negligence claim, to allege that Uber owed her a duty as a common carrier.  *See supra*.  Plaintiff cannot cure the deficiencies of that pleading by alleging it under the heading NIED.  Second, even if Plaintiff had successfully alleged that Uber owed her a duty of a common carrier so as to adequately allege a claim of negligence, that claim would bar her NIED claim as duplicative.

A NIED claim cannot be asserted if it is "essentially duplicative of tort or contract causes of action."  *Djangmah v. Falcione*, 2013 WL 208914, *9 (S.D.N.Y. Jan. 18, 2013) (quoting *Wolkstein v. Morgenstern*, 713 N.Y.S.2d 171 (1st Dep't 2000)); *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) ("The New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available.") (citing *Fischer v. Maloney*, N.E.2d 1215, 1217 (1978)).  "The rationale for this rule is grounded in the underlying purpose of the common law tort of negligent infliction of emotional distress which 'has its roots in the acknowledgment by the courts of the need to provide relief in those circumstances where traditional theories of recovery do not.'"  *Virgil v.*

*Darlak*, 2013 WL 4015368, at *10 (W.D.N.Y. Aug. 6, 2013) (quoting *Lee v. McCue*, 410 F. Supp. 2d 221, 226-27 (S.D.N.Y. 2006), *aff'd*, 218 F. App'x 26 (2007)).  In this case, the allegations supporting the NIED claim track the allegations supporting Plaintiff's negligent screening, hiring, and supervision claim, as well as her negligence claim—they all concern whether Uber breached its duty by failing to implement safety measures or by negligently hiring, retaining, and supervising Hussain, which permitted Hussain to sexually assault Plaintiff.  *See Poulos v. City of New York*, 2015 WL 5707496, at *10 (S.D.N.Y. Sept. 29, 2015) (dismissing NIED claim that was "based on the same conduct that constitutes the basis for Plaintiff's state law claims for harassment, intimidation, assault and battery, failure to protect, neglect and failure to provide medical treatment, and negligence"); *Richardson v. City of New York*, 2015 WL 7752143, at *19 (S.D.N.Y. Nov. 18, 2015) (dismissing NIED claim based "on the same conduct giving rise to his state law claims for negligence and medical malpractice"); *C.T. v. Valley Stream Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 328 (E.D.N.Y. 2016) (dismissing negligent infliction of emotional distress claim because plaintiff's arguments mirrored her claim for negligent supervision); *Virgil*, 2013 WL 4015368, at *10 (dismissing NIED claim because the "conduct that provides the basis for [the plaintiff's] claim for negligent infliction of emotional distress is the same conduct underlying his claim for medical malpractice").

### D.    Negligent or Fraudulent Misrepresentations

Plaintiff also moves for liability on the grounds that Uber "conceal[ed] and affirmatively misrepresent[ed] the danger—especially to female riders—of its service."  Compl. ¶ 50.  The Court construes these allegations as an attempt to plead common law negligent or fraudulent misrepresentation.

To state a claim for negligent misrepresentation under New York law, a plaintiff must plead: "(1) the defendant had a duty, as a result of a special relationship, to give correct

information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012).  To state a claim for fraudulent misrepresentation, a plaintiff must plead: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).  The misrepresentation element is identical to both claims.  *See, e.g.*, *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 21 (2d Cir. 2000) (noting statements that are "conclusory and/or constitute mere puffery" cannot form the basis "of a claim for [either] fraudulent and/or negligent misrepresentation") (quoting *Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (1st Dep't 2000)).  In addition, "[e]ssential to both of these claims is a causal nexus that 'defendant's misrepresentation must have induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation).'"  *Minzer*, 2020 WL 2621710 (quoting *Laub v. Faessel*, 745 N.Y.S2d 534, 536 (1st Dep't 2002)).

Plaintiff alleges that Uber made material misrepresentations to customers regarding the safety of its services and that Plaintiff suffered and continued to suffer as a result of Uber's deception.  She points to the following alleged misrepresentations: that "Uber is committed to connecting you to the safest ride on the road," Uber "set[s] the strictest safety standards possible,

and then work[s] hard to improve them every day," the "specifics" of those safety standards "vary depending on what local governments allow, but within each city [Uber] operate[s], [it] aim[s] to go above and beyond local requirements to ensure your comfort and security—what [Uber] [is] doing in the US is an example of [its] standards around the world," and "[f]rom the moment you request a ride to the moment you arrive, the Uber experience has been designed from the group up with your safety in mind."  Compl. ¶ 18.  Plaintiff claims that Uber also made misrepresentations about its safety to female customers specifically, through ads of female passengers smiling that meant to imply that the ride is "safe" for women.  She provides two examples: one of a female passenger smiling while exiting the vehicle with text overlay of "Moving People" and "Tap a Button, Get Picked Up in Minutes"; and one of a female child smiling while riding in an Uber with text overlay of "Safest Rides on the Road" and "Going the Distance to Put People First."  *Id.* ¶ 16.  Plaintiff also alleges that she relied on Uber's safety services after her drinks with friends because of Uber's "designated rider" campaign, a pop-up kiosk in Canada to offer free rides to individuals who blew into breathalyzers, and an ad depicting a man and a woman with the words "Enjoy your journey home, Don't drink and drive"—all meant to encourage users to take an Uber to avoid driving under the influence.  *Id.* ¶ 17.  Whether these statements can form the basis of a negligent or fraudulent misrepresentation claim that survives Uber's motion to dismiss depends on (1) whether they are truly substantive representations that a reasonable consumer would rely on, rather than mere puffery; (2) whether Plaintiff sufficiently alleges that the statements were, in fact, misrepresentations and misleading; and (3) whether Plaintiff sufficiently pleads causation.

1.      **Several of Uber's Statements Constitute Substantive Representations that a Reasonable Consumer Would Rely On**

Whether a statement is puffery is a legal question that may be determined from the allegations in the complaint.  *See, e.g.*, *Geffner v. Coca-Cola Co.*, 928 F.3d 198, 200 (2d Cir. 2019) (affirming dismissal of negligent misrepresentation claim as inactionable puffery).  The test of whether a statement is puffery, in this context, is whether the statement makes "[s]ubjective claims about products, which cannot be proven either true or false." *Lipton v. Nature Co.*, 71 F.3d 465, 474 (2d Cir. 1995).  "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (citation omitted).  It "may occur in the form of 'a general claim of superiority over comparable products,' or, alternatively, as 'an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying.'" *Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 369-70 (S.D.N.Y. 2019) (quoting *Time Warner Cable*, 497 F.3d at 160).  Put another way, a plaintiff "must allege a statement specific enough to be falsifiable." *Fusco*, 2018 WL 3618232, at *6.  A statement that conveys "only the seller's opinion that its product is superior [is one] no consumer could claim to have justifiably relied on." *Id.* at *6.  By contrast, "[a] statement of overall quality can constitute an actionable misrepresentation if the statement is phrased in absolute terms"; in addition, "a statement that compares a general quality—such as safety—between two products is falsifiable if the quality is measurable." *Id.*

Measured against these standards, most of the challenged statements "constitute mere puffery or 'dealers talk' or 'sales talk.'" *Coppelson v. Serhant*, 2021 WL 148088, at *7 (S.D.N.Y. Jan. 15, 2021) (quoting *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 276 (S.D.N.Y. 2004)).  Statements that an Uber ride is "safe" or that the "Uber

30

experience has been designed from the group up with your safety in mind" are general statements that "convey only the seller's opinion that its product is superior, such that no consumer could claim to have justifiably relied on them." *Fusco*, 2018 WL 3618232, at *6; *see id.* ("[B]ald assertions of superior quality are puffery if they lack detailed claims that could be measured or tested."); *B&M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 482 (S.D.N.Y. 2010) (dismissing statement "topnotch output fit for a 5 star customers [sic]" as puffery); *Loubier v. Allstate Ins. Co.*, 2010 WL 1279082, at *5 (D. Conn. Mar. 30, 2010) (dismissing insurer's advertisement "You're in good hands with Allstate" as puffery). They are not "falsifiable" or "measurable." The "claim that a product is 'safe' generally . . . is puffery" because it conveys only a "general term[] of quality, not specific characteristics." *Fusco*, 2018 WL 3618232, at *7. "Even if Plaintiff had alleged that one out of every ten of Defendant's passengers was assaulted or that Defendant's safety record was twice as bad as any competing service, it would still be a matter of opinion whether this risk would be too high to be called 'safe.'" *Id.* Other statements in the Complaint, such as those encouraging inebriated consumers to take an Uber and the ad that depicts a female passenger and says that consumers can "tap a button" and "get picked up in minutes," have not been alleged to be false by Plaintiff.

Uber argues that the statements that Uber is "committed" to connecting consumers to the "safest ride on the road," sets the "strictest safety standards possible," and offers the "safest rides on the road," and that Uber "aim[s] to go above and beyond local requirements to ensure your comfort and safety" also constitute inactionable puffery. It claims no reasonable consumer could rely on the statements because they are couched in aspirational terms or are vague and hyperbolic. *See Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (statements qualified with terms such as "aims to," "wants to," and "should"

not actionable as securities fraud).  Uber points to *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016), in which the district court held that identical statements made by Uber were puffery because they were "boastful and self-congratulatory" and "vague and "hyperbolic."  For example, the court stated, if Uber "literally set the 'strictest safety standards possible' at the outset, it could not 'improve them every day.'"  *Id.*  Similarly, in *DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, 2018 WL 10247483, at *12 (N.D. Cal. Sept. 24, 2018), a district court held that such statements regarding safety were inactionable because "what constitutes a 'gold standard' and/or 'the safest ride on the road' is in the eye of the beholder."

In contrast, Plaintiff points to *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 861 (N.D. Cal. 2015), in which the court held that the same statements regarding safety were actionable because they contained "'specific' assertions that seem to describe 'absolute characteristics' of Uber's services that could be tested," for example, the same language about "setting the strictest safety standards possible."  Thus, a "reasonable consumer reading these statements in the context of Uber's advertising campaign could conclude that an Uber ride is objectively and measurably safer than a ride provided by a taxi or other competitor service, i.e., it is statistically most likely to keep riders from harm.  References to the 'strictest safety standards' and explicit comparisons with competitor taxi services reinforce the impression that Uber's statements are grounded in fact."  *Id.*  A second court held the same statements were actionable for identical reasons.  *See Delux Cab, LLC v. Uber Techs., Inc.*, 2017 WL 1354791, at *5 (S.D. Cal. Apr. 13, 2017) ("Where a challenged statement includes 'aspirational' language, a court must still determine whether it 'is extremely unlikely to induce consumer reliance.'") (internal citation omitted).

The language that Uber is "committed" to connecting consumers to the "safest ride on the road" is aspirational puffery.  *See Pontiac*, 752 F.3d at 183.  Presumably, every company offering transportation services aims to offer safety and aspires and commits to providing the "safest" ride.  No reasonable consumer could understand the statement to warrant that Uber has been successful in its commitment and that by accepting a ride in an Uber car, the consumer will in fact receive the safest ride on the road.  The statement that Uber "aim[s] to go above and beyond local requirements to ensure your comfort and safety" is also aspirational puffery.  There may be a myriad of regulations and rules with respect to comfort and safety in each local jurisdiction.  There is nothing in Uber's statement from which a consumer could draw as to which regulation or rule Uber "aims to go above and beyond," or that, in fact, Uber's measures do exceed what is necessary under law.  Its language that it "aims to" "suggests a company actively working to improve . . . rather than one expressing confidence in their complete (or even substantial) effectiveness."  *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019); *see Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683-84 (S.D. Tex. 2015) (noting that Uber's statement that it "'aim[s] to go above and beyond local requirements' contains aspirational language, which prevents a reasonable consumer from relying on it as a statement of fact" because "statements containing modifiers such as 'aims to' . . . are mere puffery").[8]

In contrast, Uber's statement in an advertisement that its company offers the "safest rides on the road"—without any aspirational language—and its statement that it will "set[] the strictest safety standards possible" could convey to a reasonable consumer the message that Uber offers

---

[8] *See also In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *34 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (finding UBS's claims that it went "above and beyond what laws and regulations require" constituted non-actionable puffery).

safety standards and rides better than competitors that a consumer might choose to use in lieu of Uber.  Compl. ¶ 16.  "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made."  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

Uber offers a product in the form of a downloadable smartphone application that connects riders with drivers.  To sell that product, Uber commits to potential consumers that it provides the "safest rides on the road," will "set[] the strictest safety standards possible" and provide some form of screening of its drivers.  Compl. ¶ 16, 18.  "When viewed in the context of the overall promotion," Uber's representations about its safety, and why consumers should choose to purchase an uber ride, can be "construed as concrete or factual."  Wayne L. Pines & Coleen Klasmeier, FDA Advertising and Promotion Manual, ¶ 310 (J.W. Schomisch, ed.) (1996), *available at* 1996 WL 34386473.  Taken in context, "safe" and "safest" have been found to constitute factual claims, not puffery.  *See L.A. Taxi*, 114 F. Supp. 3d at 861-63 (finding Uber's statements like "setting the strictest safety standards possible," to be actionable); *Giles v. Inflatable Store, Inc.*, 2009 WL 961469, at *4 (D. Colo. Apr. 6, 2009) ("A reasonable jury could determine that the word 'safest' has a specific, quantifiable meaning: . . . most likely (among all competing products) to keep participants from harm.").  Uber's representations also indicate that Uber's safety standards are measurable and concrete against its competitors.  *See Delux Cab*, 2017 WL 1354791, at *6 ("[A] reasonable consumer might conclude that Uber's claims that its rides are safest, its standards are strictest, and its background check procedures are more rigorous than competitors' are based in objectively measurable fact, and might reasonably rely upon them in deciding whether or not to use Uber.").

Deceptive advertisements are those in which the words and images, taken together and in context, would mislead a reasonable consumer.  *See S.C. Johnson & Son, Inc. v. Clorox Co.*, 241

F.3d 232, 238 (2d Cir. 2001); *Ault*, 2014 WL 1998235, at *6.  To be misleading, the "overall net impression," *Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 314 (7th Cir. 1992), created in the mind of the consumer must "conflict[] with reality," *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016); *Bd.-Tech Elec. Co. v. Eaton Corp.*, 737 F. App'x 556, 558-59 (2d Cir. 2018).  In these determinations, "context is crucial." *Manuel v. Pepsi-Cola Co.*, 2018 WL 2269247, at *8 (S.D.N.Y. May 17, 2018) (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013)).  Here, the overall net impression of an advertisement depicting a smiling female child with the caption "safest rides on the road" is that Uber offers rides that are—specifically for female passengers—both objectively safe and safer than Uber's competitors.  A consumer viewing this advertisement, having no access to underlying reports to contradict or clarify that apparently factual claim, would reasonably believe this claim to be true and to rely on it.

A reasonable consumer would also believe that the "safety" claims that Uber promotes include non-traffic-related driver behavior.  In the common lexicon, representations of safety encompass physical and emotional security.  Sexual assault, as alleged here, is unequivocally a form of physical and emotional harm.  A "safe ride" is not one that involves assault or risk thereof.  Uber's own terms reinforce this interpretation.  Uber advertises the "safest rides on the road."  Compl. ¶ 16.  If Uber had wanted to limit its claim to the make and model, features, or maintenance of the cars, they could have said "connecting you to the safest *cars* on the road."

### 2.   Plaintiff Sufficiently Alleges that Uber's Statements Misrepresented Safety Risks

Plaintiff sufficiently alleges that Uber's statements about the safety of its rides were misrepresentations that concealed safety risks.  Asserting that a product in its entirety (or majority) has a quality, when in fact only a portion of that product has that quality, is materially

deceptive.  *See Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 466 (S.D.N.Y. 2020)

(holding that plaintiff stated a claim for fraud and a claim under GBL § 349 regarding a bagel

sold as a "Blueberry Bagel" that in fact contained only a few real blueberries and primarily

contained imitation blueberries); *Kacocha v. Nestle Purina Petcare Co.*, 2016 WL 4367991, at

*15 (S.D.N.Y. Aug. 12, 2016) (holding that plaintiff stated a claim regarding a bacon-themed

dog treat, which was composed of a small fraction of bacon and a much larger fraction of "non-

meat fillers"); *Albert v. Blue Diamond Growers*, 151 F. Supp. 3d 412, 415, 418-19 (S.D.N.Y.

2015) (holding that plaintiff stated a claim regarding "almond milk" marketed as a "heart healthy

food" that was only 2% almonds); *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *15-16

(E.D.N.Y. July 21, 2010) (holding that plaintiff stated a claim regarding "vitaminwater" that was

primarily water and sugar despite the inclusion of some vitamins; the court found it misleading

because advertising suggested it was healthy and composed *only* of vitamins and water); *But see

Parks v. Ainsworth Pet Nutrition, LLC*, 2020 WL 832863, at *1-2 (S.D.N.Y. Feb. 20,

2020), *appeal withdrawn*, 2020 WL 3422356 (2d Cir. June 2, 2020) (finding that trace amounts

of glyphosate, well below FDA limits, did not render a food's "natural" label misleading).

Uber labeled its rides as the "safest," without qualifiers, plausibly inducing a belief that

all the reasonably relevant components of the rides would be the "safest."  It is also plausible that

doing so would mislead a reasonable consumer about the portion of the rides that are not safe.

The Complaint includes an annual number of reports of sexual assault, which, taken as true,

indicates that Uber had data on the safe/unsafe composition of its driver pool at the time of

Plaintiff's assault.  There is no indication from the pleadings that Uber has shared that data with

customers or created a feature to flag drivers that have been reported.  Unsafe drivers remain

"indistinguishable" from safe drivers.  (In contrast, the "VIP" option that Plaintiff used to call

her ride distinguished between inexperienced and experienced drivers. *See* Complaint ¶ 29.).
Plaintiff, therefore, has plausibly alleged that Uber misrepresented the safety of its rides.

If Uber had made underlying safety information "a matter of public record," Marcus v.
AT&T Corp., 138 F.3d 46, 64-65 (2d Cir. 1998), such that "the plaintiffs could review the
financial information and evaluate the risk for themselves," In re Merrill Lynch & Co. Rsch.
Reps. Sec. Litig., 568 F. Supp. 2d 349, 360-62 (S.D.N.Y. 2008), their claims might not have
been misleading.  See In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 566, 578-79 (S.D.N.Y.
2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) (finding that the phrase "committed to providing the
highest quality products to our guests" and assertions of quality that is "highest in the industry"
were not false or misleading, because they were accompanied by qualifying and mitigating
statements on the same webpages or during the same investor calls).  But there is no indication
that Uber did so prior to the assault on Plaintiff.

### 3.      Plaintiff Has Sufficiently Alleged Causation

In order to recover for the physical and emotional harm of the assault under a claim of
negligent or fraudulent misrepresentation, Plaintiff must plead both transaction causation and
loss causation.  Transaction causation requires an allegation that "defendant's misrepresentation
induced plaintiff to engage in the transaction in question."  *Laub*, 745 N.Y.S.3d at 536.  In
*Minzer*, the court held that plaintiff had established transaction causation: "[H]e would not have
chosen the service but for Uber's safety promises."  *Minzer*, 2020 WL 2621710, at *5-6.  Here
too, Plaintiff has alleged that she ordered an Uber because of her reliance on Uber's safety
promises, adequately pleading transaction causation.  *See* Compl. ¶ 29.

In contrast to transaction causation, loss causation "is the causal link between the alleged
misconduct and the . . . harm ultimately suffered by the plaintiff," *Fin. Guar. Ins. Co. v. Putnam
Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015) (quoting *Lentell v. Merrill Lynch & Co.*,

396 F.3d 161, 172 (2d Cir. 2005)).  Because Plaintiff seeks damages not for her Uber fare but for

her assault, she must allege that the "subject of the fraudulent statement or omission was the

cause of the actual loss suffered."  *Id.* (quoting *Lentell*, 396 F.3d at 173).[9]  "Loss causation is

lacking unless the fraudulent statement that induced [plaintiff] . . . can also be shown to have

made her . . . more disposed to suffer the alleged harm."  *Loreley Fin. (Jersey) No. 3 Ltd. v.

Wells Fargo Sec., LLC*, 797 F.3d 160, 186 (2d Cir. 2015); *see also L.A. Taxi*, 114 F. Supp. 3d at

867 ("[R]eliance is proved by showing that the defendant's misrepresentation or nondisclosure

was an immediate cause of the plaintiff's injury-producing conduct.") (quoting *In re Tobacco II

Cases*, 207 P.3d 20, 39 (Cal. 2009)).  To establish loss causation, Plaintiff must plead "both that

the loss be foreseeable and that the loss be caused by the materialization of the concealed risk."

*Lentell*, 396 F.3d at 173.[10]

"To prove that the loss-inducing event was foreseeable, plaintiffs must establish that

the risk of the event occurring 'was within the zone of risk concealed by the misrepresentations

and omissions alleged . . . .'"  *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 363

---

[9] Claims of injury resulting from deceptive marketing are overwhelmingly pursued as class actions; as a result, because of the individualized determinations necessary to address damages based on reliance, cause, and injury, most of these claims are limited to statutory damages, and the consumers allege reliance on the representation only insofar as they buy the good—they allege that they suffer the injury of paying a price premium, but no other injury.  However, courts agree that a plaintiff could pursue a personal injury claim—and non-statutory damages beyond merely a price premium—following reliance on deceptive marketing.  *See, e.g., In re Amla Litig.*, 282 F. Supp. 3d 751, 756-57 (S.D.N.Y. 2017) (certifying a class under GBL § 349 for full refunds and statutory damages, while leaving open the possibility of larger damages for "graver injuries"); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 533-34 (E.D.N.Y. 2017) (certifying a class for refunds and statutory damages, plus separate trials for individual damage claims).
[10] *Lentell* arises in the federal securities law context; however, the standard for loss causation in this context is borrowed from the standard applied to common law causation.  *See Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("We have often compared loss causation to the tort law concept of proximate cause, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.'") (quoting *Castellano*, 257 F.3d at 186).

(S.D.N.Y. 2009) (quoting *Lentell*, 396 F.3d at 173) (emphasis omitted).  Liability can arise from

the realization of any number of specific risks within the zone of risk.  *See In re Gen. Elec. Co.*

*Sec. Litig.*, 857 F. Supp. 2d 367, 399 (S.D.N.Y. 2012) (finding that defendant's representations

of having no difficulty issuing commercial paper, of being "safe and secure," and of not having

"exposure" to subprime loans would lead a reasonable investor to believe that the possibility of a

dividend slash was remote); *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 188-89 (2d Cir.

2001) (finding that concealment of a potential "major corporate transaction" covered both

merger and leveraged recapitalization).  In both cases, the defendant "disguised the very risk to

which [plaintiff] fell victim." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d at 368

(quoting *Castellano*, 257 F.3d at 189) (internal quotation marks omitted).  Representations of

safety, as discussed above, tend to imply security from a range of physical and emotional harms.

These representations thus encompass—and conceal—a broad zone of risk.  As discussed above,

sexual assault falls within that zone.

Plaintiff alleges that Uber has "lax screening procedures," which have resulted in

"thousands" of sexual assaults, and that Uber "provides zero oversight of its drivers" during

rides.  Complaint ¶ 1.  If these allegations are taken as true, Uber's statements about the safety of

its rides are misrepresentations which conceal safety risks, including the risk of sexual assault.  It

is foreseeable that Uber's statements about the safety of its rides, if taken as true, would cause a

reasonable person to enter the zone of risk they conceal.  Thus, Plaintiff has sufficiently alleged

that Uber's misrepresentations concealed a foreseeable risk covering sexual assault of a rider by

a driver, which then materialized.  Plaintiff has also sufficiently alleged that her reliance on

Uber's misrepresentations caused the loss she suffered—her assault.  Plaintiff alleges that she

relied on Uber's campaigns which included the safety claim when she "ordered an Uber to get

her safely back home," and that she "allowed herself to nod off in the car" because she was "comforted by being escorted by Uber's premier driving service." Compl. ¶¶ 29, 31.  Absent this reliance, Plaintiff may have chosen not to make the 40-to-45-minute trip home at a late hour while intoxicated.  Or, she may have been more vigilant—as she might have been in another form of transportation—and remained awake during the ride.  Instead, intoxicated, tired, and with a false sense of security, she fell asleep—all of which made her more susceptible to an attack.

Accordingly, because Plaintiff has plausibly alleged that Uber made certain material misrepresentations about safety on which Plaintiff relied and which caused her harm, she has stated a viable claim for negligent misrepresentation.

### E.      New York General Business Law § 349

To state a claim under Section 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrell & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012)); *accord Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).  "[A]n action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), but need only meet the bare-bones pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (internal citations omitted).

"Although a private plaintiff need not plead or allege reliance under Section 349, she is required to show that the material deceptive act caused the injury." *Rivera v. Navient Solutions, LLC*, 2020 WL 4895698, at *7 (S.D.N.Y. Aug. 19, 2020) (internal citations omitted); *see Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 2013) ("[P]roof that a material deceptive

act or practice caused actual, although not necessarily pecuniary, harm is required to impose compensatory damages.") (citation and internal quotation marks omitted).

For the reasons stated in the previous section, Plaintiff has adequately pleaded consumer-oriented conduct, material deception, and causation.  Plaintiff has thus met the requirements of Rule 8(a) and stated a claim under § 349.

### F.     Leave to Amend

Federal Rule of Civil Procedure 15(a) permits a party to "amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  Courts are to "freely give leave when justice so requires." *Id.*; *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("[I]t is within the sound discretion of the district court to grant or deny leave to amend.").  "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

Plaintiff requests leave to amend should the Court find that any of Plaintiff's claims require further factual detail.  The Court will permit Plaintiff an opportunity to amend the complaint to add allegations that support Uber owed a duty to Plaintiff and its passengers as a common carrier.  Plaintiff will also be permitted to amend with the complaint with additional facts regarding Uber's knowledge of Hussain's propensity for sexual assault.

## CONCLUSION

The motion to dismiss is DENIED IN PART and GRANTED IN PART without

prejudice.  If Plaintiff intends to file an amended complaint, she shall do so by August 27, 2021.

The Clerk of Court is respectfully directed to close Dkt. No. 10.


SO ORDERED.


Dated: July 28, 2021
      New York, New York             _____
                                             LEWIS J. LIMAN
                                  United States District Judge